CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

10/15/2024

LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
      DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## (Lynchburg Division)

| | |
|---|---|
| **BRIAN YOUNGER,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:24CV00051 |
| ) | |
| **CITY OF LYNCHBURG,** ) | Jury Trial Demanded |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Brian Younger ("Mr. Younger" or "Plaintiff"), by counsel, and as his Complaint against Defendant City of Lynchburg (the "City" or "Defendant"), states as follows:

## NATURE OF THE ACTION

1. Mr. Younger brings this action against the City – which established and operates the Lynchburg Fire Department – seeking damages for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), arising from Defendant's discrimination and retaliation against Mr. Younger.

## PARTIES

2. Mr. Younger is a citizen of the United Sates of America and resident of Campbell County, Virginia.

3. At all times relevant to this Complaint, Mr. Younger was employed by the City as a Firefighter.

4. The City is an independent city within the Commonwealth of Virginia under the authority of Title 22.2 of the Virginia Code and a "person" subject to suit within the meaning of 42 U.S.C. § 1981.

5. The City is an "employer" as defined by 42 U.S.C. § 2000e(a)-(b) and is thus covered by, and subject to, the provisions of Title VII and Section 1981.

**JURISDICTION, VENUE, AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6. This Court has jurisdiction of the claims in this action pursuant to 28 U.S.C. § 1331, as this action contains federal questions presented by Title VII and Section 1981.

7. Venue is proper in this Court, as the acts and/or omissions of Defendant from which Plaintiff's claims arise occurred within Lynchburg, Virginia, which is part of the territories assigned to the Lynchburg Division of the Western District of Virginia. See 28 U.S.C. § 1391(b)(2).

8. Mr. Younger has satisfied the procedural and administrative requirements of Title VII and Section 1981, and all conditions precedent to the filing of this suit have been performed or have occurred:

   a. On July 12, 2024, Mr. Younger timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Virginia Office of the Attorney General's Office of Civil Rights ("OCR") against Defendant, styled Charge No. 438-2024-01276 (the "Charge").

   b. The Charge alleged discrimination based on race and retaliation.

   c. On July 17, 2024, the EEOC issued a Dismissal and Notice of Right to Sue to Mr. Younger, and this Complaint has been filed within ninety days of Mr. Younger's receipt of the same.

## FACTS

9. Brian Younger is a 46-year-old Black man who has worked for the Lynchburg Fire Department since 2007.

10. During Mr. Younger's fifteen (15) year tenure with the City, he has generally met or exceeded the City's performance expectations.

11. In Mr. Younger's 2017 performance evaluation, his supervisor opined that Mr. Younger was a "solid asset to the team" who was "a quiet leader."

12. Around the same time, Mr. Younger was given a video with audio recording of his colleague, Scott Hargis (White male), screaming at Mr. Hargis's wife.

13. In the video, Mr. Hargis employed liberal use of the "n-word" throughout, accusing his wife of sleeping with Black men.

14. Mr. Younger was greatly disturbed by the recording and showed it to several of his Black colleagues in the workplace, attempting to gather a group of employees who would present the recording to management and make a complaint about the racial climate in the workplace.

15. However, Mr. Younger's colleagues did not feel safe participating in such a report, fearing retaliation. Ultimately, every employee Mr. Younger asked to stand with him declined.

16. A few weeks after beginning to speak with his colleagues about the recording, Mike Thomas, Battalion Commander (Black male), instructed Mr. Younger to speak to Deputy Chief Greg Wormser (White male).

17. When Mr. Younger reported to Deputy Chief Wormser's office, he was asked about the recording.

18. While Mr. Younger attended the meeting expecting that the City would assure Mr. Younger that it would handle Mr. Hargis's clear misconduct and racism appropriately, he instead found himself the subject of scrutiny.

19. Deputy Chief Wormser began the conversation by telling Mr. Younger he had been made aware of the recording in which Mr. Hargis made disparaging remarks about Black people.

20. Mr. Younger confirmed and stated that he did not know what to do about the information, expressing his feelings of hurt and betrayal that Mr. Hargis had made such statements.

21. Inexplicably, Deputy Chief Wormser asked Mr. Younger if he planned to harm Mr. Hargis, which Mr. Younger vehemently denied.

22. Deputy Chief Wormser then encouraged Mr. Younger to accept an apology from Mr. Hargis, implying that the situation would not be addressed further afterward.

23. While Mr. Younger was prepared to accept Mr. Hargis's apology, Mr. Hargis chose to offer said apology by arriving at Mr. Younger's personal residence at 9:00 in the morning with a six-pack of beer.

24. Mr. Hargis began the conversation by asking Mr. Younger if he was recording the interaction.

25. Mr. Younger, offended by this question, told Mr. Hargis that he was no longer interested in his apology.

26. Mr. Younger generally avoided Mr. Hargis in the workplace after that.

27. Mr. Hargis has been promoted twice since the 2017 interaction, despite his clear discriminatory animus toward Black Americans.

28. In Mr. Younger's 2018 performance evaluation, Mr. Younger's supervisor stated that Mr. Younger "truly underestimates himself and his abilities."

29. The same year, Mr. Younger was noted to have been called on to investigate more fires than any other investigator who worked for the City throughout 2018.

30. During 2020, Mr. Younger began to call out racism and microaggressions in the workplace where he saw them. As a result, Mr. Younger experienced targeted discrimination and retaliation.

31. Supervisory staff at the City began to scrutinize Mr. Younger's unit more than other units. Battalion Chief Kenny Turner (White male), in particular, began to "check up" on everything Mr. Younger did despite not being Mr. Younger's supervisor.

32. BC Turner made multiple attempts to initiate disciplinary action against Mr. Younger for contrived reasons.

33. For example, in or around October 2020, Mr. Younger was working his assignment at Station 4 when the station experienced a "COVID scare" in which an employee suspected that they had become infected with COVID-19.

34. Jennifer Collins, Health and Safety Coordinator, told employees that if they underwent a COVID test after experiencing symptoms, they should not return to work until they received the test results.

35. Mr. Younger had experienced symptoms and taken a test, so he did not report to work one day in October 2020 while awaiting his results in accordance with the policy. So as to not leave the Lynchburg Fire Department short-staffed, Mr. Younger arranged for a colleague to cover his shift.

36. When Mr. Younger did not report to work, Battalion Chief ("BC") Kenny Turner (White male) called BC Allen Carwile (White male) to complain that Mr. Younger had "no call/no

5

showed." BC Turner did not contact Mr. Younger about his absence prior to escalating his complaint to BC Carwile.

37. BC Carwile called Mr. Younger to ask for clarification, and Mr. Younger told him that he was following the COVID protocol. He disclosed that he had negotiated an agreement with his colleague to cover his shift.

38. BC Carwile told Mr. Younger that BC Turner was "on the warpath, trying to get" Mr. Younger.

39. Mr. Younger filed a formal complaint about BC Turner's behavior on October 12, 2020, feeling that he was being targeted unreasonably for disciplinary action based upon his race and his prior reports of racial discrimination in the workplace.

40. The City undertook a hasty investigation, and the complaint was quickly deemed "unfounded" despite Mr. Younger's evidence.

41. Shortly after the close of the investigation, at the end of December 2020, Mr. Younger was speaking to a colleague, Frankie Fowler (White male), when the subject of the workplace environment came up.

42. Mr. Younger shared during that conversation that he had experienced racial discrimination and hostility at the Lynchburg Fire Department.

43. Mr. Fowler responded with disbelief and asked who, specifically, had treated Mr. Younger in that manner.

44. When Mr. Younger provided names, including Mr. Hargis's, Mr. Fowler expressed further disbelief.

45. Mr. Younger asked why Mr. Fowler had such a difficult time believing his report, but received no answer.

46. Captain Quincy Scott (Black male), another colleague, was present during the conversation, which never got combative on either side.

47. The next time Mr. Younger worked, shortly after January 6, 2021, he was accused of "ganging up on" Mr. Fowler with Capt. Scott.

48. Mr. Younger was accused of cornering Mr. Fowler and attempting to "force him to say [the "n-word"]," which never happened.

49. Mr. Younger felt, yet again, that this was clear retaliation for his discussion of racial discrimination in the workplace.

50. Around the same time, Mr. Younger shared a meme on his social media showing a photo of the January 6, 2021 rioters attempting to climb the walls of the Capitol. The image had been edited to superimpose photos of butter crackers on the rioters. Mr. Younger, who was not aware that this could be seen as a reference to a slur, reposted the image to his personal social media account.

51. Mr. Younger was aware that he had colleagues who had traveled to Washington, D.C. on January 6, 2021 to take part in the riot.

52. Several days later, Mr. Younger met with a City Attorney who questioned him about Mr. Fowler's false report.

53. The attorney also showed Mr. Younger a copy of the social media post and informed him that some of his colleagues had found it offensive, though all of Mr. Younger's colleagues on his social media had interacted positively with the post.

54. Late in January 2021, Mr. Younger was contacted by the wife of his colleague, Brennan Lawson (White male), who provided Mr. Younger with videos with audio of Mr. Lawson screaming the "n-word" at pedestrians he drove past while in the car.

55. Though Mr. Younger attempted to show this video to supervisory staff, they were uninterested in discussing it.

56. Mr. Younger also attempted to show the video at a City Hall meeting, but he was not allowed to do so.

57. In particular, during the City Hall meeting, then-Human Resources Coordinator Nicole Campbell and the acting Deputy City Manager, Kent White, refused to allow Mr. Younger to show them the video.

58. On February 27, 2021, Mr. Younger worked with Master Firefighter ("MFF") Colao Lombre to cover his shift while he took his son to the Dentist. Firefighters covering each other's shifts was common at the City.

59. When MFF Lombre reported for duty, Command Staff refused to allow him to cover Mr. Younger's shift and instead chose to put Ms. Younger's entire unit out of service, leaving the entirety of the unit's territory without available fire and EMS response for hours.

60. White employees covered one another's shifts regularly without issue.

61. In June 2021, Mr. Younger received his performance review, which was positive. In this evaluation, Mr. Younger was described as a "good problem solver" who "always looks professional and interacts well with others" and "expresses his ideas openly, honestly, and respectfully."

62. Mr. Younger was encouraged to seek promotion due to his positive performance. He was described by BC Carwile as "a pleasure to work with" and "always respectful and well-spoken."

63. In the fall of 2021, Mr. Younger began to have difficulty with a citizen with whom he had attended school, Julian "Brian" Richie.

8

64. Mr. Younger and Mr. Richie grew up in the same neighborhood and were in the same peer group as students.

65. In the fall of 2021, Mr. Richie, who had been rejected by a woman, had a public meltdown on social media over the rejection.

66. Mr. Younger, who had been Mr. Richie's friend, reached out to speak to Mr. Richie and to attempt to help calm him. He was worried about Mr. Richie's mental health and reputation and reached out to support him.

67. However, Mr. Richie, who believed without evidence that Mr. Younger was involved with the woman, took Mr. Younger's concern as an attack and began to lash out at him aggressively.

68. Mr. Richie told others that he was going to "send [his] people to go visit" Mr. Younger because he claimed Mr. Younger "disrespected" him.

69. He stated that Mr. Younger "needs his jaw broke" and that he wanted Mr. Younger's "jaw wired shut."

70. He stated, "It's a bounty on his lower jaw."

71. In some messages, Mr. Richie discussed speaking with his nephews about harming Mr. Younger, who he claimed "said Unk we owe you a favor. I asked them how do yall feel about breaking somebody jaw? They were like bet. Thats easy. [sic]"

72. He stated that he had challenged Mr. Younger to a fight, but that Mr. Younger had declined.

73. Mr. Richie stated, "I want to wire his jaw shut soooo bad."

9

74. On one occasion, at 2:53 A.M., Mr. Richie sent Mr. Younger a photo of a firearm in Mr. Richie's lap while he sat in his vehicle with the message, "I went to go kill a man tonight. Gun in hand and everything."

75. Though Mr. Younger urged Mr. Richie over dozens of messages to take a step back from provoking confrontation, Mr. Richie continued to escalate, repeatedly challenging Mr. Younger to a fight.

76. Mr. Richie insulted Mr. Younger in nearly every message, seemingly in an attempt to provoke him.

77. Around this time, Mr. Younger was off-duty and out of uniform driving when he spotted Mr. Richie outside his home. He resolved to stop and attempt to have a calm conversation about the recent conflict.

78. Mr. Younger exited his vehicle and leaned against it, making no moves toward Mr. Richie or his home.

79. Mr. Richie immediately went inside the home, telling Mr. Younger, "I got something for you." Mr. Younger understood this to be a threat.

80. Mr. Richie did not return outside, and Mr. Younger left after only a few minutes.

81. Later, a family member of Mr. Richie called the City to complain that Mr. Younger had made threats toward Mr. Richie.

82. Mr. Younger also heard from a mutual acquaintance that Mr. Richie had returned to his home to retrieve his firearm, which he intended to use to threaten Mr. Younger.

83. On October 11, 2021, Mr. Younger received a notice of discipline intent from the City. In the notice, the City alleged that Mr. Younger had threatened Mr. Richie.

84. No detail regarding what threat was alleged was provided.

85. The notice also claimed that a colleague of Mr. Younger had felt threatened when Mr. Younger said, "Hey (employee name) how you feelin'."

86. Though the employee is not identified in the notice, Mr. Younger recalls greeting Mr. Fowler this way while their respective units were at the grocery store shopping for station meals.

87. No explanation was provided for how this statement was considered threatening.

88. The letter also noted Mr. Younger's social media post from January, despite the post occurring some ten (10) months earlier.

89. Though Mr. Younger attempted to provide the City with the many screenshots he had of threats he had received from Mr. Richie, the City refused to accept or even review his evidence and moved forward with the discipline as proposed.

90. On July 16, 2022, Mr. Younger arrived at work to find that Mr. Lawson had left his personal items on Mr. Younger's bunk.

91. On seeing the items, Mr. Younger asked aloud who the items belonged to.

92. Mr. Lawson, who was in the next bunk, stated that the items were his and that he would move them.

93. Mr. Younger stated that he didn't want other people's personal items on his bunk and asked Mr. Lawson not to use his bunk as storage in the future. He then left the bunk room to retrieve more of his personal items from his vehicle.

94. When Mr. Younger returned to the bunk room, Mr. Lawson's items were still on his bunk. Mr. Younger began to move the items himself.

95. In response, Mr. Lawson became defensive, saying, "I was gonna get the stuff, dude."

11

96.    Mr. Younger said, "Yes, but you didn't. Don't ever touch any of my belongings again, Brennan."

97.    Mr. Lawson asked why Mr. Younger was "making such a big deal" out of his invasion of Mr. Younger's space before stating he "didn't do anything to [Mr. Younger's] bed."

98.    Mr. Younger replied, "I don't know what you might've done, just don't ever touch my belongings."

99.    Mr. Lawson continued to argue, and Mr. Younger continued to ask him not to touch his belongings in the future. Eventually, Mr. Younger left the bunk room again.

100.    As Mr. Younger returned to the bunk room again, Mr. Lawson was coming out of the room, walking the opposite direction, and the two passed by one another.

101.    Mr. Lawson stopped and looked Mr. Younger up and down in a threatening manner. Mr. Younger asked if Mr. Lawson had something to say to him.

102.    Mr. Lawson told Mr. Younger, "Don't ever get in my face again." Mr. Younger replied that he had not been in Mr. Lawson's face.

103.    Mr. Lawson repeated his demand, screaming that Mr. Younger should not "get in [his] face" before asking, "What's your problem? We're supposed to be friends." Mr. Younger replied that he and Mr. Lawson were not friends and referenced the recording from Mr. Lawson's ex-wife of Mr. Lawson using slurs before she left him due to his racist beliefs. Mr. Lawson then went to report to Capt. Scott, while Mr. Younger spoke to MFF Lombre who calmed him down.

104.    On July 16, 2022, Mr. Younger complained to Capt. Scott and BC Carwile that racial inequities are allowed to continue in the City's fire department because administration allows them to go unchecked.

12

105. Mr. Younger also stated that the fire administration failed him by allowing racial inequities to occur and go unchecked for years. Mr. Younger also stated that the fire department is just worried about optics and not working to correct the problem.

106. On July 18, 2022, an investigation was instigated, and Mr. Younger was placed on paid administrative leave pending the outcome of the investigation.

107. Mr. Younger's employment was not terminated until nearly two (2) years later, on June 4, 2024.

108. The investigatory report was not provided to Mr. Younger until in or around the second week of September 2024.

109. From the report, Mr. Younger discovered that the investigation actually concluded on August 29, 2022.

110. The investigatory report, authored by BC Carwile, falsely determined that Mr. Lawson's allegations were founded.

## COUNT I:
### RACE-BASED DISPARATE TREATMENT IN VIOLATION OF TITLE VII AND SECTION 1981

111. Mr. Younger hereby incorporates each of the above paragraphs as though fully set forth herein.

112. At all times relevant to this Complaint, Mr. Younger was an employee of the City.

113. The City is an employer that employs more than 500 employees.

114. Mr. Younger belongs to a protected category under Title VII and Section 1981 because he is African-American/Black.

115. At all times relevant to this complaint, Mr. Younger performed his job duties in accordance with the City's legitimate expectations.

116. Mr. Younger made repeated complaints to the City about the racially derogatory behavior of his colleagues, including Mr. Hargis and Mr. Lawson.

117. Despite Mr. Younger's reports, Mr. Hargis was promoted multiple times after being recorded using racial slurs.

118. Despite Mr. Younger's reports, Mr. Lawson was not disciplined after being recorded using racial slurs.

119. BC Carwile, who authored Mr. Younger's investigatory report, was not terminated even after being arrested for domestic violence.

120. However, Mr. Younger was terminated for allegations from Mr. Lawson, about whom he had previously complained.

121. Despite a deficient investigation, Mr. Lawson's reports were deemed founded.

122. By terminating Mr. Younger under circumstances where similarly-situated White employees were not disciplined, the City discriminated against Mr. Younger based on his race in violation of Title VII and Section 1981.

123. The City's discriminatory actions toward Mr. Younger have caused him to suffer financially, economically, socially, mentally, emotionally, and physically. This harm is ongoing.

## COUNT II:
### RETALIATION IN VIOLATION OF TITLE VII AND SECTION 1981

124. Mr. Younger hereby incorporates each of the above paragraphs as though fully set forth herein.

125. Mr. Younger belongs to a protected category under Title VII and Section 1981 because he is African-American/Black.

126. Beginning in 2017, Mr. Younger made complaints about racial animus in the workplace, which he continued to make regularly throughout the termination of his employment.

14

127.   Mr. Younger reported Mr. Hargis's use of racial slurs.

128.   Mr. Younger reported Mr. Lawson's use of racial slurs.

129.   On July 16, 2022, Mr. Younger stated that racial inequities are allowed to continue in the City's fire department because administration allows them to go unchecked.

130.   Mr. Younger also stated on July 16, 2022 that the fire department is "just worried about optics" and "not willing to correct the [racism] problem."

131.   By engaging in the communications described above, Mr. Younger was opposing discriminatory language and actions by his colleagues. As such, the communications described above constitute protected activity under Title VII and Section 1981.

132.   On July 18, 2022, Mr. Younger was placed on administrative leave pending investigation.

133.   On August 29, 2022, the investigation was concluded. No copy of the investigatory report was provided to Mr. Younger.

134.   On June 4, 2024, Mr. Younger was terminated.

135.   The City provided Mr. Younger with a copy of the investigatory report in or around the second week of September 2024.

136.   The City terminated Mr. Younger on June 4, 2024 based on the complaints described above. In doing so, it committed unlawful retaliation in violation of Title VII and Section 1981.

137.   The City's discriminatory actions toward Mr. Younger have caused him to suffer financially, economically, socially, mentally, emotionally, and physically. This harm is ongoing.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendant and order that Plaintiff is entitled to all damages available under the law to be proven at trial, including without limitation, equitable relief, compensatory damages, lost wages and benefits, emotional distress damages, punitive damages, together with prejudgment interest, attorneys' fees and costs for prosecuting Plaintiff's claims, and such further relief available under the law.

**JURY DEMAND**

A TRIAL BY JURY IS DEMANDED.

Dated: October 15, 2024                     Respectfully submitted,

                                    By:    */s/ Ashley R. Passero*
                                           Ashley R. Passero (VSB No. 90462)
                                           Attorney for Plaintiff
                                           LawrenceQueen
                                           701 E. Franklin Street, Suite 700
                                           Richmond, Virginia 23219
                                           Telephone: (804) 643-9343
                                           Facsimile: (804) 643-9368
                                           *apassero@lawrencequeen.com*