CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

8/15/2025
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

BRIAN YOUNGER,

*Plaintiff,*

v.

THE CITY OF LYNCHBURG,

*Defendant.*

CASE No. 6:24CV00051

<u>OPINION</u>

JUDGE NORMAN K. MOON

Plaintiff Brian Younger, a former firefighter for the City of Lynchburg, alleges that the City discriminated and retaliated against him on the basis of race, in violation of (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and (ii) Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The City moves to dismiss Younger's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Younger has not exhausted his administrative remedies and that he states no claim for relief. *See* Dkt. 05 (motion); Dkt. 06 (mem. in support). For the reasons set forth below, the City's motion is **DENIED.**

## I.    Legal Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv.*, *LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). When ruling on a motion to dismiss, the court "may . . . consider documents incorporated into the complaint by reference, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (internal quotation marks and citation omitted).

## II.    Background

Plaintiff Brian Younger is a Black man and Virginia resident who worked for the Lynchburg Fire Department for 15 years. Dkt. 01 ¶¶ 9-10. Younger alleges that he experienced several instances of race-based scrutiny and disparate treatment during his employment tenure, and he contends that he was ultimately fired as retaliation for attempting to address these issues. *See* Dkt. 01 ¶¶12-110. The alleged mistreatment began about ten years into his term, when he was shown a disturbing video. Dkt. 01 ¶¶ 12-13.

2

### A.  The Hargis Video

In or around 2017, Younger "was given" a video in which, his colleague, Scott Hargis, is shown screaming at Hargis' wife. Dkt. 01 ¶ 11-12. Hargis accuses her of sleeping with Black men, and he uses the n-word liberally. *Id.* Hargis is a white male. *Id.*

Younger was "greatly disturbed" by the video. *Id.* ¶ 14. He saw it as "clear misconduct and racism." Dkt. 01 ¶¶ 12-13, 18. Concerned about the video and the racial climate in the workplace, he showed it to several of his Black colleagues. *Id.* ¶ 14. He sought to "gather a group of employees who would present the recording to management and make a complaint." *Id.* But every employee he asked to "stand with him" feared retaliation and declined. *Id.* ¶ 15.

Within a few weeks of the video surfacing, Younger was instructed to speak to then-Deputy Chief Greg Wormser (white male). *Id.* ¶¶ 16-17. Wormser told Younger that he was aware of the video. *Id.* ¶ 19. Younger expected that Wormser would seek to address the issue, and he stated "express[ed] his feelings of hurt and betrayal that [] Hargis had made such statements." *Id.* ¶¶ 18-20. But rather than Wormser laying out a plan to confront Hargis, Younger himself became "the subject of scrutiny." He was asked "if he planned to harm [] Hargis." *Id.* ¶¶ 18-21. He said no. *Id.* ¶ 21. He was encouraged to accept an apology from Hargis. *Id.* ¶ 22. (To him, this implied that the problem "would not be addressed further afterward.") *Id.* ¶ 22. And although he was "prepared to accept" an apology from Hargis, he did not expect the apology to take the form of Hargis showing up at Younger's home "at 9:00 in the morning with a six-pack of beer." *Id.* ¶ 23. At his doorstep, Hargis asked Younger "if he was recording the interaction." *Id.* ¶ 24. Younger was offended by the question and told Hargis that he was no longer interested in his apology. *Id.* ¶ 25. Younger generally avoided Hargis in the workplace after that. *Id.* ¶ 26.

Despite the tension, both Hargis and Younger remained in good standing in their

companies. Younger's 2018 performance evaluation stated that he "truly underestimates himself

and his abilities," and he was "called on to investigate more fires than any other investigator who

worked for the City throughout 2018." Dkt. 01 ¶¶ 28-29. Hargis, for his part, was twice

promoted since the 2017 video surfaced, despite what Younger characterizes as Hargis's "clear

discriminatory animus toward Black Americans." *Id.* ¶ 27.

### B. Turner and Fowler Conversations

Several years later, as the COVID-19 pandemic took hold, Younger alleges that he

"began to call out racism and microaggressions in the workplace where he saw them," which

only led to further discrimination and retaliation against him. Dkt. 01 ¶ 30. For instance,

supervisory staff at the City "began to scrutinize [] Younger's unit more than other[s]." *Id.* ¶ 31.

In particular, Battalion Chief[1] Kenny Turner "began to check up on everything [] Younger did

despite not being [] Younger's supervisor." *Id.* BC Turner went so far as to initiate disciplinary

action against Younger for "contrived reasons." When Younger experienced COVID symptoms

and arranged for a colleague to cover his shift (in accordance with company policy), BC Turner

escalated the situation by going to BC Allen Carwile (white male) to complain that Younger had

"no call/no showed." *Id.* ¶¶ 33-36.

BC Carwile called Younger to ask for clarification. He responded that he was simply

following COVID protocol and had asked a colleague to cover his shift. *Id.* ¶ 37. BC Carwile

confided in him that Turner was "on the warpath, trying to get [him]." *Id.* ¶ 38. BC Turner had

never attempted to contact Younger. *Id.* ¶ 36.

Younger filed a formal complaint about BC Turner's behavior, "feeling that he was being

targeted unreasonably for disciplinary action based upon his race and his prior reports of racial

---

[1]    As Younger does, the Court hereafter abbreviates the title of "Battalion Chief" as "BC."

discrimination in the workplace." *Id.* ¶ 39. But the City's "hasty investigation" concluded that Younger's claim was "unfounded." *Id.* ¶ 40.

Later on, Younger was speaking with his colleague, Frankie Fowler (white male), when "the subject of the workplace environment came up." Dkt. 01 ¶ 41. Younger expressed that he had experienced racial discrimination and hostility at the fire department, to which Fowler responded with disbelief. *Id.* ¶¶ 42-43. When Younger provided names and specifics, Fowler only expressed "further disbelief." *Id.* ¶ 44. When Younger asked why Fowler had such a hard time believing him, Fowler did not respond. *Id.* ¶ 45. Captain Quincy Scott (Black male) was present during the conversation. *Id.* ¶ 46.

Although the conversation "never got combative on either side," Younger soon found himself accused of "ganging up" on Fowler the next time Younger worked. *Id.* ¶¶ 45-46. The accusation charged that Younger and Captain Scott had "corner[ed]" Fowler and attempted to "force him to say the n-word," which Younger maintains "never happened." *Id.* ¶¶ 47-48. Younger felt that this interaction, like the BC Turner interaction, "was clear retaliation for his discussion of racial discrimination in the workplace." *Id.* ¶ 49.

### C.  A String of Incidents in Early 2021

In January 2021, in the aftermath of the attack on the U.S. Capitol, Younger shared a meme on his social media profile showing the January 6 rioters attempting to climb the walls of the Capitol. *Id.* ¶ 50. The meme superimposed photos of butter crackers on the rioters. *Id.* Younger was aware that several of his colleagues had traveled to Washington that day to participate in the attack. *Id.* He was not aware that the reference to butter crackers could be seen as a slur. Dkt. 01 ¶¶ 50-51.

During a meeting a City attorney questioned Younger about the social media post. Dkt.

01 ¶¶ 52-53. The meeting was called to discuss Younger's interaction with Fowler, based on
Fowler's complaint, but during the conversation, the attorney showed Younger a copy of the
social media post and "informed him that some of his colleagues had found it offensive," despite
Younger's colleagues on social media interacting positively with the post. *Id.*

Several weeks later, Younger received more disturbing videos. The wife of one of his
colleagues, Brennan Lawson, contacted Younger directly and provided several video recordings
of Lawson screaming the n-word at pedestrians while he drove past them in his car. *Id.* ¶ 54.
Younger attempted to show the video to his supervisors, but "they were uninterested in
discussing it." *Id.* ¶ 55. Younger similarly tried to present the video during his remarks at a City
Hall meeting, but City staff (then-Human Resources Coordinator Nicole Campbell and the acting
Deputy City Manager, Kent White) prohibited him from doing so. *Id.* ¶¶ 56-57.

The next month, Younger needed to take off work to get his son to a dentist appointment,
so he negotiated with his colleague, Colao Lombre, to cover his shift. Dkt. 01 ¶ 58. Firefighters
covering each other's shifts was common at the City, and white employees covered one
another's shifts regularly without issue. *Id.* ¶¶ 58-60. But when Lombre reported for duty as
Younger's shift cover, Command Staff at the department "refused to allow him to cover" and
instead "chose to put [] Younger's entire unit out of service, leaving the entirety of the unit's
territory without available fire and EMS response for hours." *Id.*

Despite this string of tense interactions in early 2021, Younger continued to be "a
pleasure to work with" and was "always respectful and wellspoken," according to his supervisor,
BC Carwile, the same person who had confided in Younger about BC Turner's "warpath." Dkt.
01 ¶¶ 61-62. Younger was encouraged to seek promotion. *Id.* His June 2021 performance review
described him as a "good problem solver" who "always looks professional and interacts well

with others" and "expresses his ideas openly, honestly, and respectfully." *Id.*

### D.  Notice of Discipline

In October 2021, Younger received a "notice of discipline intent" from the City. Dkt. 01

¶ 83. The notice made three allegations. First, it alleged that Younger had threatened a

Lynchburg resident, Julian Richie. *Id.* ¶ 84. The notice provided "[n]o detail" regarding the

alleged threat. *Id.* Second, it claimed that one of his colleagues had felt threatened when Younger

said, "Hey how you feelin'." *Id.* ¶¶ 85-87. Younger recalls greeting Fowler this way while their

respective units were at the grocery store shopping for station meals, but no employee is

identified in the notice and no explanation was provided for how Younger's statement was

considered threatening. *Id.* Finally, it mentioned his January 6 social media post from some ten

months earlier. *Id.* ¶ 88.

In response, Younger attempted to provide the City with the background on the Richie

"threat," but the City refused his evidence. Dkt. 01 ¶ 89. Specifically, Younger would have stated

that he initially reached out to support Richie (whom he had known from school) after he had

been rejected by a woman and had a "public meltdown on social media," but that Richie

responded negatively and aggressively and began threatening him. Dkt. 01 ¶¶ 64-68. When

Younger eventually decided to stop at Richie's house to have a conversation, Richie again

responded aggressively and later filed the complaint with the City. Dkt. 01 ¶¶ 67-82. Younger

"attempted to provide the City with the many screenshots he had of threats he had received from

Mr. Richie, [but] the City refused to accept or even review his evidence and moved forward with

the discipline as proposed." Dkt. 01 ¶ 89.

### E.  Lawson Altercation

In July 2022, Younger arrived at work to find that Lawson (his colleague from the n-

word screaming video) had left his personal items on Younger's bunk. He "asked aloud who the items belonged to." Lawson, who was in the next bunk, stated that the items were his and that he would move them. Younger stated that he didn't want other people's personal items on his bunk and asked Lawson not to use his bunk as storage in the future. He then left the bunk room to retrieve more of his personal items from his vehicle. *Id.* ¶¶ 90-93.

When Younger returned to the bunk room, Lawson's items were still on his bunk, so he began to move the items himself. In response, Lawson became defensive, saying, "I was gonna get the stuff, dude." Younger said, "Yes, but you didn't. Don't ever touch any of my belongings again, Brennan." Lawson asked why he was "making such a big deal" out of it and stated that he "didn't do anything to [Younger's] bed." Younger replied, "I don't know what you might've done, just don't ever touch my belongings." Lawson continued to argue, and Younger continued to ask him not to touch his belongings in the future. Eventually, Younger left the bunk room. *Id.* ¶¶ 94-99.

When Younger later returned, he crossed paths with Lawson as Lawson was exiting. Lawson stopped and said, "Don't ever get in my face again." Younger replied that he had not been in his face. Lawson repeated his demand that Younger not "get in [his] face" and said, "What's your problem? We're supposed to be friends." *Id.* ¶ 103. Younger replied that they were not friends and referenced Lawson's use of racial slurs in the recording he had seen. At that point, as Lawson moved toward Younger and Younger continued calling Lawson racist, colleagues intervened. *Id.*

Lawson then went to report to Captain Scott while Younger spoke to Lombre, who calmed him down. *Id.* Younger also went to Captain Scott separately. He complained to Scott and BC Carwile that "the fire administration failed him" by allowing racial inequities to occur

and "go unchecked" for years. Dkt. 01 ¶¶ 105-106. He stated that the fire department was "just worried about optics and not working to correct the problem." *Id.*[2]

On July 18, 2022, an investigation was initiated, and Younger was placed on paid administrative leave pending the outcome of the investigation. Dkt. 01 ¶ 106. Younger was terminated two years later, in June 2024. *Id.* ¶ 107. The investigatory report, authored by BC Carwile, was provided to Younger two months later. The report stated that the investigation had concluded in August 2022. The report found that Lawson's allegations were true. *Id.* ¶¶ 106-110.

### F.  Legal Proceedings

Younger filed a charge of discrimination with the EEOC and the Virginia Attorney General's Office of Civil Rights ("OCR"), styled Charge No.438-2024-01276 (the "Charge"), on July 12, 2024. Dkt. 01 ¶ 8. The Charge alleged discrimination and retaliation based on race. *Id.* Five days after receiving the charge, the EEOC issued a "Dismissal and Notice of Right to Sue." *Id.* Younger filed the instant action within ninety days of receiving that notice. *Id.*

## III.   Discussion

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 requires that "[a]ll persons within the jurisdiction of the United States shall have the same right in every

---

[2]     The City emphasizes that the next day, July 17, 2022, Lawson filed a criminal complaint accusing Younger of assaulting him during the altercation, and he received a protective order which was to remain in effect until September 7, 2024, requiring Younger to surrender any firearms that he owned to law enforcement. *See* Dkt. 6 at 6-7 (citing attached exhibits). The City argues that the Court can take judicial notice of these records. *Id.* at 6 n.1. However, the Court has been unable to locate the records after reasonably diligent inquiry. Furthermore, the Court cannot otherwise consider these records because they are not referenced in or "integral to the complaint." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). Accordingly, such records are not properly presented at the motion to dismiss stage.

State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C.

§ 1981(a); *see also Aleman v. Chugach Support Services, Inc*., 485 F.2d 206, 208 (4th Cir. 2007).

Claims for relief under Title VII and Section 1981 are treated the same. *See Love-Lane v. Martin*,

355 F.3d 766, 786 (4th Cir. 2004); *Boyer-Liberto v. Fontainebleau Corp*., 786 F.3d 264, 281 (4th

Cir. 2015). However, Title VII claims are subject to administrative exhaustion requirements,

whereas Section 1981 claims are not. The City of Lynchburg disputes Younger's administrative

exhaustion in this case. Thus, as follows, we first determine whether Younger has exhausted his

Title VII administrative remedies. We then proceed to determine whether Younger has stated

claims for relief as to Title VII discrimination (Count 1) and retaliation (Count II). We conclude

that Younger survives dismissal in all respects.

### A.  Title VII Administrative Exhaustion Issue

"Prior to pursuing a Title VII claim in federal court, a plaintiff must exhaust her

administrative remedies by filing a charge of discrimination with the EEOC." *Hentosh v. Old

Dominion Univ*., 767 F.3d 413, 416 (4th Cir. 2014); *see* 42 U.S.C. § 2000e-5(b), (e)(1), (f)(1).

Requiring a party to file with the EEOC "ensures that the employer is put on notice of the alleged

violations," allows the employer a chance to remedy the discrimination before litigation

commences, and provides the parties recourse to resolution in a more efficient and less formal

manner. *Sydnor v. Fairfax County, Va*., 681 F.3d 591, 593 (4th Cir. 2012) (quoting *Miles v. Dell,

Inc*., 429 F.3d 480, 491 (4th Cir.2005)). Motions to dismiss a Title VII claim for failure to

exhaust administrative remedies are properly brought as Rule 12(b)(6) motions to dismiss for

failure to state a claim. *See Ft. Bend Cnty., Texas v. Davis*, 587 U.S. 541, 551 (2019) ("Title

VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional

prescription delineating the adjudicatory authority of courts.")

Here, the City argues that Younger has failed to exhaust his administrative remedies in three ways:

(1) The EEOC acted prematurely when it issued Younger a right to sue letter before the 180-day holding period had expired;

(2) The EEOC failed to conduct any investigation into Younger's claims; and

(3) The EEOC failed to notify the City of the charges against it.

However, as explained in the following analysis, the City's arguments are misplaced. First, the EEOC is <u>not</u> precluded from issuing a right to sue notice before the 180-day period has expired. *See* Subsection 2(a), *infra*. Second and third, although the EEOC <u>is</u> required to investigate all charges and notify any respondents named in the charge, the Court reasonably *infers* that an investigation occurred, because the EEOC can only issue dismissals after conducting an investigation. Furthermore, the Fourth Circuit has more broadly recognized that "[a] Title VII complainant is not charged with the commission's failure to perform its statutory duties." *Russell v. Am. Tobacco Co*., 528 F.2d 357, 365 (4th Cir. 1975). These factors suggest that Younger is not faulted for an alleged lack of investigation or notice by the EEOC, such that the City's plea for remand must be dismissed.

### 1.  *Law Regarding Notice, Investigation, and Dismissal*

Section 2000e–5(b) of Title VII requires the EEOC to (i) investigate all charges filed and (ii) notify an employer of any charges filed against it. 42 U.S.C. § 2000e–5(b) ("Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, . . . alleging that an employer . . . has engaged in an unlawful employment practice, the Commission **<u>shall</u>** serve a notice of the charge . . . on such employer . . . within ten days, and **<u>shall</u>** make an investigation thereof.") (emphasis added). The EEOC's duties of investigation and notice are thus mandatory.

*See Sierra Club*, 909 F.3d at 645 (" 'Shall' is an unambiguously mandatory term."); *Martini*, 178

F.3d at 1346 ("Thus . . . the Commission's duty to investigate is both mandatory and

unqualified").

If the EEOC "determines after such investigation that that there is not reasonable cause to

believe that the charge is true," the EEOC must dismiss the charge and notify the claimant and

the respondent of its action. 42 U.S.C. § 2000e–5(b). If the EEOC dismisses a charge, the

claimant has ninety days after receiving notice of the dismissal to initiate a civil action against

the respondent named in the charge. *Id.* § 2000e–5(f)(1). If the EEOC does not—within 180 days

of receiving the charge—either (i) dismiss the charge, (ii) initiate its own civil enforcement

action, or (iii) enter into a conciliation agreement, the EEOC must notify the claimant of his right

to initiate a civil action within the next 90 days. *Id.* § 2000e–5(f)(1).

### 2.   *Analysis*

#### a.   *Failure to Abide by Purported 180-Day Holding Period*

The City first argues that the EEOC wrongly dismissed his charge before the 180 day

period. The City relies on Judge Dillon's opinion in *Hardy v. Lewis Gale Med. Ctr., LLC*, to

support this argument. *See* Dkt. 06 at 10 (citing 377 F. Supp. 3d 596 (W.D. Va. 2019)). In

*Hardy*, the district court considered whether an EEOC regulation was contrary to law. The

regulation, 29 C.F.R. § 1601.28(a)(2), allowed the EEOC to issue right to sue letters earlier than

180 days whenever the Commission found it "probable" that it will be "unable to complete its

administrative processing of [a] charge within 180 days." 29 C.F.R. § 1601.28(a)(2). *Hardy* held

that the regulation was contrary to law and invalid because it allowed the EEOC to "forego its

statutory duty" by issuing right to sue notices without conducting any investigation, often at the

aggrieved person's request, and "sometimes only days after the charge is filed." *Hardy*, 377 F.

Supp. 3d at 610.

However, contrary to the City's interpretation, *Hardy* is limited to cases in which the

EEOC premised its right to sue determination on being "unable to complete its administrative

processing of [a] charge within 180 days," per 29 C.F.R. § 1601.28(a)(2). *Hardy* involved

several plaintiffs, some of whom were granted the right to sue based on 29 C.F.R. §

1601.28(a)(2), while others were granted the right to sue based on normal dismissal of their

claims. *See Hardy*, 377 F. Supp. 3d at 610, n.5. Notably, the court did not remand the claims that

were dismissed by the EEOC upon an agency finding that the claims did not support a violation.

This was true even where charges were dismissed by the EEOC only days after being filed, *i.e.*,

well before the purported 180-day holding period had expired. *See Id.*, n.5 (allowing Sanders I to

proceed where he filed a charge on April 03 and received a right to sue notice on April 5). The

only claims that the court remanded for failure to exhaust were those claims based on 29 C.F.R.

§ 1601.28(a)(2). Thus, to the extent the City makes such an argument here, remand is not

required merely because the EEOC issued Younger's right to sue letter before 180 days had

expired. The possibility that the dismissal was premised on 29 C.F.R. § 1601.28(a)(2) is

addressed in the following section.

> b. *Failure to Investigate*

The City next argues that remand is required for the EEOC's failure to investigate. In his

complaint, Younger pleads simply that "the EEOC issued a Dismissal and Notice of Right to

Sue." Dkt. 01 ¶ 8. Accordingly, he does not literally plead that an investigation occurred.

That being said, the City relies less on parsing Younger's pleadings and more on its

contention that "the EEOC could have conducted no investigation" *because* the EEOC

"dismissed the plaintiff's Charge prior to giving the City an opportunity to file a position

statement." Dkt. 06 at 9. Neither basis of decision—Younger's pleadings or the City's

argument—is conclusive.

First, the statutory structure of Title VII implies that where there was a dismissal, there

was an investigation, such that Younger's facts regarding dismissal plead the occurrence of an

investigation. The word "dismiss" appears only twice in the pertinent provisions of Title VII, *see*

§§ 2000e–5(b) and (f)(1), and in neither instance does a dismissal occur without an

investigation.[3] For example, Section 2000e–5(b) provides that "[i]f the Commission determines

<u>after such investigation</u> that there is not reasonable cause to believe that the charge is true, it <u>shall</u>

<u>dismiss</u> the charge and promptly notify the person claiming to be aggrieved and the respondent

of its action." *Id.* § 2000e–5(b) (emphasis added). No other provisions in the statute authorize the

EEOC to dismiss a charge without an investigation. Under this reasoning, it is reasonable to

assume that a plaintiff like Younger, who pleads facts regarding a dismissal, pleads facts

regarding an investigation.

But we must acknowledge that *Hardy* undermines this argument. The pleadings do not

rule out the possibility that the EEOC followed the same procedure for Younger as it did for

some of the plaintiffs in *Hardy*. In other words, on the facts pled, the EEOC <u>may have</u> dismissed

Younger's charge on the basis that the EEOC was "unable to complete its administrative

processing of the charge within 180 days," pursuant to 29 C.F.R. § 1601.28(a)(2). This Court is

not bound by *Hardy*'s determination that such a basis of dismissal was an invalid regulatory

action, but *Hardy*'s reasoning is persuasive: Where the statute requires an investigation prior to

---

3    *See* § 2000e–5(b) ("If the Commission determines after such investigation that there is not reasonable cause
to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved
and the respondent of its action."); *id.* § 2000e–5(f)(1) (providing that if the EEOC does not—within 180 days of
receiving the charge—either (i) dismiss the charge, (ii) initiate its own civil enforcement action, or (iii) enter into a
conciliation agreement, the EEOC must notify the claimant of his right to initiate a civil action within the next 90
days).

dismissal, a regulation cannot allow for dismissal without an investigation. Thus, to the extent

that Younger's dismissal was a *Hardy* dismissal based on 29 C.F.R. § 1601.28(a)(2), the City has

an argument for remand.

All in all, though, *Hardy* does not control the analysis here. The City relies on *Hardy* but

submits no argument to support the conclusion that Younger's dismissal was *Hardy*-type.

Younger, for his part, does not categorically disavow the possibility that his dismissal was

*Hardy*-type, but he submits that "[t]he EEOC, of its own volition, chose to dismiss the charge

and issue the Notice of Dismissal . . . based upon its investigation of the charge," without him

making any request for the right to sue, unlike the plaintiffs in *Hardy*. Dkt. 09 at 12-13. He

further submits in his memorandum of law that he was dismissed "in accordance with the

regulations at 29 C.F.R. § 1601.18(a)."[4] Dkt. 09 at 13. This is not the regulation at issue in

*Hardy*, and it suggests that his claim was dismissed after proper investigation. Without more

facts on this issue, the Court will not preemptively order a remand merely because it cannot rule

out the possibility that Younger's dismissal was based on 29 C.F.R. § 1601.28(a)(2).

Second, putting *Hardy* aside, the Court does not credit the City's argument that "the

EEOC could have conducted no investigation" simply <u>*because*</u> the EEOC "dismissed the

plaintiff's Charge prior to giving the City an opportunity to file a position statement." Dkt. 06 at

9. The unstated assumption in the City's argument is that whenever the EEOC conducts an

investigation, it necessarily must provide respondents with an opportunity to file a position

statement. But the City provides no support for this assumption. The Court notes that 29 C.F.R. §

1601.15 states that "[a]s part of each investigation, the Commission will accept any statement of

---

<sup></sup>    4    *See* 29 C.F.R. § 1601.18(a) ("Where a charge on its face, or as amplified by the statements of the person claiming to be aggrieved discloses, or where after investigation the Commission determines, that the charge and every portion thereof is not timely filed, or otherwise fails to state a claim under title VII, the ADA, GINA, or the PWFA, the Commission shall dismiss the charge.").

15

position or evidence" that the respondent "wishes to submit," but this does not <u>require</u> the EEOC

to solicit position statements in all instances. Indeed, it would be nonsensical to collect position

statements where the EEOC dismisses a charge for being baseless.

Accordingly, although Younger has not literally pled facts to show that the EEOC

conducted its statutorily-required investigation, his pleadings support the inference of an

investigation based on his receipt of a notice of dismissal and right to sue. The City's arguments

to the contrary are unavailing.

### c. *Failure to Provide Notice*

Last, the City argues that the EEOC failed to provide it with due notice of the charge.

Section 2000e–5(b) indeed requires the EEOC to notify an employer of any charges filed against

it. 42 U.S.C. § 2000e–5(b). However, the City's argument regarding notice appears in fits and

spurts and largely overlaps with its preceding failure-to-investigate argument. The City contends

that it "was not notified of the filing of the plaintiff's Charge of Discrimination," but in the same

breath emphasizes that the lack of notice meant the City was not "given an opportunity to

respond before the EEOC dismissed [the charge]." *See* Dkt. 10 at 1. As noted above, the City

was not entitled to file a response where a charge was being dismissed, and the City provides

little else. Importantly, the City does not claim that it will be unduly prejudiced by the instant

action occurring without proper EEOC notice. In this light, the City's argument seeking remand

rings hollow.

The Court recognizes that a major purpose of the Title VII exhaustion regime is to

"ensure[] that the employer is put on notice of the alleged violations." *Sydnor v. Fairfax County,

Va*., 681 F.3d 591, 593 (4th Cir. 2012) (quoting *Miles v. Dell, Inc*., 429 F.3d 480, 491 (4th Cir.

2005)). But courts in the Fourth Circuit have also held that clerical errors by the EEOC should

16

not serve as a tripwire for discrimination plaintiffs. *Russell v. Am. Tobacco Co*., 528 F.2d 357, 365 (4th Cir. 1975) ("A Title VII complainant is not charged with the commission's failure to perform its statutory duties."); *see also Williams v. Ocean Beach Club, LLC*, No. 2:09CV461, 2011 WL 2015345, at *5 (E.D. Va. Apr. 29, 2011) (citing *Russell* and holding that where EEOC failed to serve notice of amended charge upon defendants, agency's failure did not "frustrate a Title VII complainant's statutory right to sue"); *Pearsall v. Child Advoc. Commn. of Lower Cape Fear, Inc*., 2000 WL 33682693, at *3 (E.D.N.C. Feb. 15, 2000) ("The court will not hold plaintiff responsible for the EEOC's failure to notify respondents after receiving plaintiff's charge.").

On balance, we find that remanding Younger's charge for the EEOC's notice failure would not serve judicial economy or the interests of the parties, especially where the defendant does not allege prejudice.

***

For the reasons stated above, the Court rejects the City's motion to remand Younger's Title VII claims to the EEOC.

### B.  Merits of Discrimination Claim

Title VII prohibits an employer from discharging or otherwise discriminating against an employee "with respect to his . . . terms, conditions, or privileges of employment" on account of his race. 42 U.S.C. § 2000e–2(a). Absent direct evidence of discriminatory intent, Younger must plead facts that plausibly show that (1**) he is a member of a protected class, (2) he suffered from an adverse employment action, (3) he was performing in accordance with his employer's legitimate expectations, and (4) he was treated differently than similarly-situated employees outside of the protected class.** *Coleman v. Md. Court of Appeals*, 626 F.3d

17

187, 190 (4th Cir. 2010) (emphasis added).

Here, it is undisputed that Younger, as a Black man, is a member of a protected class. The remaining elements are discussed below. The thrust of Younger's claim is that the City terminated him "under circumstances where similarly-situated White employees were not disciplined." Dkt. 01 ¶ 13.

### 1. *Adverse Employment Action*

To meet the burden of showing an adverse employment action, a plaintiff must show that the alleged discrimination "adversely affect[ed] the terms, conditions or benefits of employment." *Perkins v. Intl. Paper Co*., 936 F.3d 196, 207 (4th Cir. 2019). Termination is the typical adverse employment action, although actions short of termination such as a decrease in compensation, job title, level of responsibility, or opportunity for promotion may constitute adverse employment actions. *See Holland v. Washington Homes, Inc*., 487 F.3d 208, 219 (4th Cir. 2007). At bottom, a plaintiff must show how an employer's action affects "an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355-54 (2020); *see also Perkins* 936 F.3d at 207 (finding a Black male plaintiff had not offered evidence as to how employer's failure to give him performance reviews altered the terms or conditions of his employment); *Muldrow*, 601 U.S. at 365 (Kavanaugh, J., concurring) ("The only question . . . is whether the relevant employment action changes the compensation, terms, conditions, or privileges of employment.").

Here, Younger alleges that he was the subject of various forms of discipline and that he was ultimately terminated, amounting to adverse employment actions. As to his termination, he alleges that he was fired because of Lawson's complaints regarding their altercation. Dkt. 01 ¶ 14 ("Mr. Younger was terminated for allegations from Mr. Lawson, about whom he had

previously complained."). Although he does not plead further facts regarding the basis or nature

of the termination,[5] Younger need not prove at this stage that the termination was in fact

discriminatory. Termination is, by definition, an employment action that affects "an identifiable

term or condition of employment." *Muldrow*, 601 U.S. at 355-54. The City will have an

opportunity to propose non-discriminatory justifications for the termination going forward. And

in any case, the City appears to concede that his termination was an adverse employment action:

"[T]he only evidence Plaintiff has provided of an occurrence that meets the standard for an

adverse employment action is his termination." Dkt. 06 at 12. Younger therefore satisfies the

first element.

### 2. *Satisfactory Job Performance*

To satisfy the second element, a plaintiff must show "only that he was qualified for the

job and that he was meeting his employer's legitimate expectations." *Haynes v. Waste

Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). He need not "show that [s]he was a perfect

or model employee." *Sempowich v. Tactile Sys. Tech., Inc*., 19 F.4th 643, 650 (4th Cir. 2021)

(citing *Haynes*, 922 F.3d at 225). Here, Younger's pleadings are conflicting, but overall they

plausibly support an inference that he met his employer's legitimate expectations.

Younger shows that his performance was satisfactory, if not excellent. His 2018

evaluation stated that he "truly underestimates himself and his abilities," and he was "called on

to investigate more fires than any other investigator who worked for the City throughout 2018."

Dkt. 01 ¶¶ 28-29. His 2021 performance review was also positive. He was described as a "good

problem solver" and someone who "always looks professional and interacts well with others"

---

[5] He does not plead who made the decision to terminate him, who communicated the decision, how it was communicated, or what exactly was communicated.

and "expresses his ideas openly, honestly, and respectfully." Dkt. 01 ¶ 61. He "was encouraged to seek promotion due to his positive performance. He was described by BC Carwile as "a pleasure to work with" and "always respectful and wellspoken." Dkt. 01 ¶ 62.

However, Younger does not plead any facts regarding his performance evaluations from 2021 to 2024. During this time, Younger received a notice of intent to discipline from the City; an investigation was conducted into his altercation with Lawson; and he was placed on paid administrative leave pending the outcome of the investigation. These factors count against the conclusion that he satisfied his employer's expectations, but they are not dispositive. There is no allegation that the City ever took steps to implement its "intent" to discipline him, and even an "intent" to discipline him, for largely out-of-work conduct, does not necessarily mean that he was failing his job expectations. Furthermore, while the investigation into Younger's altercation with Lawson indeed concluded (in 2022) that Lawson's allegations were "founded," Younger was not terminated until two years later—and the report's findings were not provided until three months <u>after</u> he was terminated. If the investigation had so much to do with his job performance, as the City contends, what explains the disconnect? The fact that Younger was not notified of the results of the investigation <u>during his employment</u> or even <u>upon his termination</u> refutes the notion that the investigation took any relevant measure of his job performance.

On balance, we must draw all reasonable inferences in favor of Younger at the motion to dismiss stage. Here, he plausibly states that his job performance was satisfactory. Though he was involved in disciplinary actions, altercations, and other forms of unbecoming conduct—which can certainly factor into job performance—we lack sufficient, credible information on these incidents such that they do not outweigh the facts demonstrating that he was a well-regarded and capable fireman.

### 3. *Treatment of Similarly Situated Employees*

Younger pleads sufficient facts to support the claim that he was treated differently than similarly situated white employees. Indeed, he claims that the City terminated him under circumstances where similarly-situated white employees were not even disciplined. Dkt. 01 ¶ 13. For instance, he alleges that "Hargis was promoted multiple times after being recorded using racial slurs;" that Lawson was "not disciplined after being recorded using racial slurs"; and that BC Carwile, who authored the investigatory report, was "not terminated even after being arrested for domestic violence." Dkt. 01 ¶¶ 117-19.[6]

Furthermore, he pleads that he became the subject of a various investigations and reprimands, where his white colleagues were spared. For instance, Younger pleads that only he was placed on paid administrative leave pending the outcome of the investigation into his mutual altercation with Lawson. Dkt. 01 ¶ 106. He pleads that BC Turner sought to discipline him for calling out of work for COVID symptoms, even though he had arranged for a colleague to cover his shift in accordance with company policy (leading BC Carwile to warn Younger that he was in the crosshairs of Turner's "warpath.") When Younger later took off for his son's dentist appointment, Command Staff refused to allow Colao Lombre to cover his shift, even though white employees covered one another's shifts regularly without issue. Dkt. 01 ¶¶ 58-60. Finally, he pleads that the City entered a notice of intent to discipline him based on innocuous comments ("Hey, how you feelin'") and because of his social media post criticizing the January 6 insurrection—despite the fact that the notice of discipline never disclosed how a statement like "Hey, how you feelin'" was threatening and despite the fact Younger allegedly "was not aware

---

[6] The allegation regarding BC Carwile's arrest does not disclose whether he was convicted.

that [the butter cracker image] could be seen as a reference to a slur." These allegations plausibly support the claim that he was treated differently than similarly situated white employees.

***

In sum, Younger pleads sufficient, plausible facts to support each element of his disparate treatment claim under Title VII and Section 1981.

### C.  Merits of Retaliation Claim

Title VII prohibits employers from "discriminat[ing] against any of [their] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has . . . participated in any manner in an investigation" under Title VII. 42 U.S.C. § 2000e–3(a). To state a retaliation claim, a plaintiff must show that he **(1) engaged in a protected activity, (2) suffered an adverse employment action; and that (3) there was a causal link between the protected activity and the employment action.** *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (emphasis added). Title VII retaliation claims are more expansive than disparate treatment claims.[7] The alleged adverse employment action need not affect the terms or conditions of employment, but "a plaintiff must

---

[7]    *See Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018) ("The scope of Title VII's anti-retaliation provision, § 2000e-3, is broader than the anti-discrimination provision in at least two respects. First, as the Supreme Court has held, 'the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm' because '[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace.' *Burlington*, 548 U.S. at 63, 67, 126 S.Ct. 2405. Accordingly, retaliatory actions need not 'affect the terms and conditions of employment' to come within Title VII's prohibition. Id. at 64, 126 S.Ct. 2405. However, retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity. *Id*. at 68, 126 S.Ct. 2405; *see also Thompson v. N. Am. Stainless*, LP, 562 U.S. 170, 174, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011) (reaffirming same). Second, and more importantly for this case, this Court, en banc, has held that the anti-retaliation provision protects employees even when they complain of actions that are not actually unlawful under Title VII. *Boyer-Liberto*, 786 F.3d at 282. Instead, complaining employees are protected if, at the time of their complaint, they 'have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.' *Id*.").

show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213 (4th Cir. 2022) (quoting *Burlington Northern & Santa Fe Railway Co.*, 548 U.S. 53, 68 (2006).

Here, the first two elements are satisfied. The final element, causation, is less clear, but we ultimately conclude that it is satisfied, too.

### 1. Protected Activity

"Protected activity includes complaining to superiors about suspected violations of Title VII," so long as the employee's perception of a violation is "objectively reasonable under the circumstances known to her." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 328 (4th Cir. 2018) (internal quotations omitted). Younger engaged in several instances of protected activity by lodging complaints of discrimination with his superiors, including complaints regarding: (i) Hargis's use of the n-word; (ii) Lawson's use of the n-word; and (iii) his perception that the City's fire department allowed racial inequities go unchecked, was "just worried about optics," and was "not willing to correct the problem." *See* Dkt. 01 ¶¶ 14-15. A fact finder could conclude that Younger had an objectively reasonable belief that these incidents were subjecting him to race-based mistreatment in violation of Title VII, and that he actively complained about these conditions.[8] These instances of Younger protesting perceived discrimination amount to protected

---

[8]    For instance, in discussing with Wormser the Hargis video (in which Hargis repeatedly uses the n-word), Younger expressed "feelings of hurt and betrayal" and sought Wormser's support in addressing it, but Wormser did nothing. Dkt. 01 ¶¶ 18-20. Later on, he filed a formal complaint against BC Turner, after Turner had sought to discipline him for calling out sick for COVID symptoms. When Younger received another disturbing video, this time of Lawson screaming the n-word at pedestrians, he attempted to show the video to his supervisors, but "they were uninterested in discussing it." *Id.* ¶¶ 54-55. Younger similarly tried to present the video at a City Hall meeting, but City staff prohibited him from doing so. *Id.* ¶¶ 56-57. Finally, after the altercation with Lawson, he complained to Captain Scott and BC Carwile that "the fire administration failed him" by allowing racial inequities to occur and "go unchecked" for years. Dkt. 01 ¶¶ 105-106. He stated that the fire department was "just worried about optics and not working to correct the problem." *Id.*

activities under Title VII.

### 2. *Adverse Employment Action*

We concluded above that Younger states a claim for an adverse employment action in the disparate treatment context, and we largely incorporate our aforementioned analysis and find that Younger satisfies the adverse action element here. After Younger was subject to a series of reprimands and investigations, he was terminated. These allegations support the existence of an adverse employment action against him. *See Wormuth*, 54 F.4th at 213 (stating that the alleged adverse employment action need not affect the terms or conditions of employment, but must be materially adverse, such that a reasonable worker may have been dissuaded from making or supporting a charge of discrimination).

### 3. *Causal Link*

To establish a causal nexus between protected activity and adverse action, a plaintiff can either show "a temporal proximity" between the events or that "other relevant evidence indicates 'continuing retaliatory conduct and animus'" toward the plaintiff. *Alberti v. Rector and Visitors of the U. of Virginia*, 65 F.4th 151, 156 (4th Cir. 2023) (quoting *Lettieri v. Equant Inc*., 478 F.3d 640, 650 (4th Cir. 2007)). However, "[p]urported victims of retaliation do not have to show at the prima facie stage that their protected activities were *but-for* causes of the adverse action." *Strothers*, 895 F.3d at 335 (emphasis added). An employee may simply show that the employer either understood or should have understood the employee to be engaged in protected activity, and the employer nonetheless took adverse action against the employee soon after becoming aware of such activity. *Id*. at 336.

Here, Younger seeks to draw a causal connection between his complaints and the adverse action against him, *i.e.*, being placed on administrative leave pending his investigation and being

terminated. *See* Dkt. 01 ¶¶ 132-134. In other words, he must show that his complaints *caused* the investigation and/or his discharge. To reiterate, his complaints concerned (i) Hargis's use of the n-word in the video; (ii) Lawson's use of the n-word; and (iii) his perception that the City's fire department allows racial inequities go unchecked, is "just worried about optics," and is "not willing to correct the [racism] problem." *See* Dkt. 01 ¶¶ 14-15. Temporally, his complaint regarding the Hargis video is too far removed to be relevant. That complaint occurred in 2017, and his termination occurred in 2024. *See* Dkt. 01 ¶ 12. The same goes for his complaint regarding the Lawson video. That complaint occurred in early 2021, more than three years before his termination. *Id*. ¶ 54. Accordingly, there does not exist a clear causal connection between those complaints and his termination.

However, his complaints regarding the fire department are more temporally relevant. They occurred on July 16, 2022, and days later, on July 18, the City opened an investigation and placed Younger on administrative leave. This suggests a potential causal relationship in which Younger was placed on leave and ultimately fired *because of* his complaint on July 16. What's more, his July 16 complaint was part of a larger pattern—spanning years—in which he complained of racial mistreatment. It is reasonable to infer that his singular July 16 complaint was perhaps the final straw that led to his investigation, leave, and discharge.

Nonetheless, several factors cloud this causal connection. First, his altercation with Lawson occurred in the same timeframe. How can Younger be so sure that his complaint caused the investigation, when the altercation that occurred on the same day? It is equally plausible, if not more plausible, that the altercation caused the investigation. The pleadings do not reveal the investigation's purpose or scope, though Younger does state that the investigation "falsely determined that [] Lawson's allegations were founded," supporting the inference that the

investigation concerned the altercation. This undercuts Younger's allegation that the investigation and his discharge occurred *because of* his complaint(s). Second, Younger was not officially discharged until June 2024—two years after the complaint, investigation, and leave. This further detracts from the likelihood that he was fired *because of* his complaint. Accordingly, several factual gaps raise questions about the causal connection between Younger's complaints and his termination.

But these gaps do not categorically exclude the possibility that his termination came about because of his complaint—especially when his complaint is viewed in the context of his years' long pattern of expressing grievances and protesting perceived discrimination. Indeed, Younger does not have to show that his complaint was a "but-for cause[] of the adverse action." *Strothers*, 895 F.3d at 335. It is enough that the City "either understood or should have understood" Younger to be engaged in protected activity and yet investigated him and ultimately fired him "after becoming aware of such activity." *Id*. at 336. Whether he was fired for his complaint(s), or whether he was fired for other, non-retaliatory reasons, is a question left for discovery. Thus, drawing all reasonable inferences in Younger's favor, we conclude that he has plausibly pleaded that the City discharged him in retaliation for his complaint regarding perceived discrimination.

## IV.    Conclusion

The City's motion to dismiss Younger's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Dkt. 05, is **DENIED.**

Entered this ___15th___ day of August, 2025.

26

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE